```
                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF FLORIDA
                              MIAMI DIVISION
                        CASE NO. 1:20-cv-22791-BB

VILMA MARQUEZ,

             Plaintiff,                      July 7, 2021
                                             2:30 p.m.
          vs.

NATIONAL FIRE AND MARINE
INSURANCE COMPANY,

             Defendant.                      Pages 1 THROUGH 23
_____

                   EXCERPT TRANSCRIPT OF MOTION HEARING
                   IN PERSON AND VIA THE ZOOM PLATFORM
                    BEFORE THE HONORABLE BETH BLOOM
                       UNITED STATES DISTRICT JUDGE

Appearances:

FOR THE PLAINTIFF:  ALVAREZ FELTMAN DA SILVA & COSTA, PL
(in person)         BRIAN C. COSTA, ESQ.
                    MIGUEL R. LARA, ESQ.
                    2525 Southwest 27th Avenue, Suite 200
                    Miami, Florida 33133

                    LEONARDO H. DA SILVA, PA
                    LEONARDO H. DA SILVA, ESQ.
                    2121 Ponce De Leon Boulevard, Suite 1100
                    Coral Gables, Florida 33134


FOR THE DEFENDANT:  BUTLER WEIHMULLER KATZ CRAIG
(via Zoom)          SCOTT J. FRANK, ESQ.
                    DONALD G. KELLY, ESQ.
                    400 North Ashley Drive, Suite 2300
                    Tampa, Florida 33602


COURT REPORTER:     Yvette Hernandez
(via Zoom)          U.S. District Court
                    400 North Miami Avenue, Room 10-2
                    Miami, Florida 33128
                    yvette_hernandez@flsd.uscourts.gov
```

2

1                    **I N D E X**

2       Certificate.................................        23

3

4                  **W I T N E S S**

5    **ON BEHALF OF THE PLAINTIFF:**                        PAGE

6    AL BRIZUELA
     DIRECT EXAMINATION BY MR. DA SILVA                     3
7    CROSS-EXAMINATION BY MR. FRANK                         10
     REDIRECT EXAMINATION BY MR. DA SILVA                   18
8    RECROSS-EXAMINATION BY MR. FRANK                       19

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    * * * * * * * * * *
2          THE COURT:  Good afternoon, Mr. Brizuela.  We have
3    never met before.  If you'll step forward, remain standing,
4    raise your right hand to be placed under oath.  I just want to
5    make sure that the attorneys have -- is this -- this is on for
6    them to see.
7      ALFREDO BRIZUELA, PLAINTIFF WITNESS, SWORN
8          COURTROOM DEPUTY:  Thank you.
9          MR. DA SILVA:  May it please the Court.
10         COURTROOM DEPUTY:  Can you please state your name and
11   also spell it for the record.
12         THE WITNESS:  Sure.  My name -- my legal name is
13   Alfredo Brizuela, and I go by Al.
14         COURTROOM DEPUTY:  Can you just please pull the mic a
15   little bit closer to you.
16         THE COURT:  Yeah.
17         Thank you, sir.
18         THE WITNESS:  Closer to the mic?
19         COURTROOM DEPUTY:  Yes.
20         THE WITNESS:  How is that?  Better?
21         MR. DA SILVA:  May it please the Court.
22                        DIRECT EXAMINATION
23   BY MR. DA SILVA:
24   Q.  Mr. Brizuela, you've heard the tenor of the conversation
25   we've been having with the Court on this issue.  The first
```

4

1    thing I'd like you to do is walk the Court -- my first question

2    is:  Do you require CoreLogic to come up with your ultimate

3    opinions?

4    A.  No.  It's just a source of data.

5    Q.  Could you express to the Court -- give the Court -- walk

6    the Court through your analysis, and, you know -- I mean, your

7    forensic analysis of the situation allowing you to date the

8    damage as having occurred during the policy period.

9    A.  Well, my forensic analysis of the house is to, first of

10   all, look at the documents.  There are multiple points in time

11   where there were pictures taken of the property.  And I did an

12   inspection in December.  I went back out in May of 2020.  I

13   have multiple points to analyze the damages.

14       When I looked at the damages inside the house, I looked at

15   the bubble in the ceiling.  A bubble of paint is something that

16   is -- it can only be fresh.  There's no such thing as a

17   long-term bubble.  So that can only be tied to the date of loss

18   as established by the homeowner.  The homeowner also

19   established that they never noticed any water until that moment

20   in time, the June date.

21       And then, when I get up on the roof, there's plenty of

22   evidence of wind damage, broken tiles, missing tiles, exposed

23   membrane.  So the damages associated with the loss are related

24   to wind, in addition to the testimony of the homeowner telling

25   me that in the June period there was a big storm and after that

1   storm they had the damages observed.

2   Q.  And can you express to the Court the importance of the

3   thermal imaging and your analysis of the drywall materials and

4   the amount of damage and the lack thereof to those materials

5   and how that plays into your analysis.

6   A.  Sure.  The thermal image just establishes a leak, and a

7   leak is an opening.  So the thermal is a way to identify where

8   the leak is.  And part of the -- what I have to state in my

9   opinion, that there was a wind-created opening, well, a leak --

10  and the only way you get a leak through a roof is through an

11  opening in the roof.  The roof did not fail from wear and tear

12  because it's established that it was only 17 years.  These

13  roofs have life expectancy all the way up to 25 to 50.

14  Q.  So the thermals identified where the water is entering in

15  the house through openings in the roof.  Are you able to

16  discredit or separate old damages and other potential causes of

17  loss that might be used by the Defense and interject it in the

18  case?  For example, are you able to separate Irma damage from

19  what occurred in the 2019 time frame?

20  A.  Sure.  The drywall, which is the material in the ceilings

21  of the home, is an ideal material to be able to identify time

22  frame and age.  Drywall is easily damaged by moisture.

23  Constant moisture on drywall will cause structural damage to

24  the drywall and constant moisture will cause mold growth.  The

25  lack of mold growth, the lack of structural damage to the

1  drywall, in my observation, ties it to the event.

2  Q.  In this particular case, when you looked up CoreLogic, were

3  you able to look up the exact location of this particular home?

4  A.  Well, that's the beauty of CoreLogic.  CoreLogic allows you

5  to put the address of the home and they corroborate that

6  address to a longitude and latitude.  And then they give the

7  weather -- wind weather at the house.

8      Now, CoreLogic does more than that.  They have -- you know,

9  they tell you if there's lightning strikes.  They tell you if

10  there's hail damage.  They give you a lot of information, in

11  addition to all the other services they provide.

12  Q.  Could you express to the Court, to the extent that you

13  know, about the acceptance amongst engineers, forensic

14  engineers like yourself, the utility of CoreLogic and, you

15  know, is it widely accepted or not and just walk her through

16  that.

17  A.  Sure.  It's widely accepted --

18          MR. FRANK:  Your Honor, objection.  The peer review is

19  within the field that CoreLogic is in, not within the field

20  that Mr. Brizuela is in.  So we would be dealing about

21  acceptance in meteorology.

22          THE COURT:  Sustained.

23          And I want to make sure that we stay on task with

24  regard to the methodology and this expert's reliance upon the

25  methodology.  So it is sustained.  You may continue.

```
 1              MR. DA SILVA:  Thank you, Judge.

 2    BY MR. DA SILVA:

 3    Q.  Mr. Brizuela --

 4              MR. DA SILVA:  One second, Judge.  Permit me one

 5    moment to consult.

 6        (Pause in proceedings.)

 7    BY MR. DA SILVA:

 8    Q.  Mr. Brizuela, can you keep walking us through, please, the

 9    methodology of how you dated it to this particular time frame.

10    We talked about the thermals.  We talked about the latex paint,

11    the bubbles.  We talked about the drywall.  What else, if

12    anything?

13    A.  There are multiple pictures that show the damage getting

14    worse over time.  There's the pictures of the public adjustor,

15    which -- there's pictures taken by me at various points.

16    There's the conversation with the homeowners.  And then there's

17    the material that's in this hearing, drywall.  Drywall can't

18    handle water.  And the appearance of the drywall being in good

19    condition allows me to determine the date of loss.

20        On the roof, I looked at the roof from the top side, looked

21    at the number of tiles broken.  Looking at missing tiles, only

22    wind could cause that damage.  Okay?  And that was my opinion,

23    that wind caused the damage to the roof, whether it was

24    established in CoreLogic or not.

25    Q.  Without mentioning or discussing, I guess, your peers or
```

1    other engineers, you personally, how many years have you been

2    able to compose and compile information in your testimony as a

3    professional engineer prior to having ever used CoreLogic?

4            MR. FRANK:  Objection, Your Honor.  We're only dealing

5    with the CoreLogic or --

6            THE COURT:  The qualifications are not the basis of

7    the challenge, just the methodology.

8            MR. DA SILVA:  And Your Honor, I understand.  And Your

9    Honor, I was hoping to --

10   BY MR. DA SILVA:

11   Q.  Mr. Brizuela, in terms of your methodology, how many --

12   without the use of CoreLogic, are you able to reliably come to

13   a professional opinion and have you done that in the past?  And

14   if so, for how long?

15   A.  Yes.  In the past, I've used weather data reports --

16           MR. FRANK:  Objection, Your Honor.  We're only dealing

17   with the methodology in this case.

18           THE COURT:  Sustained.

19           MR. DA SILVA:  One more moment, Judge.  One second.

20       (Pause in proceedings.)

21   BY MR. DA SILVA:

22   Q.  With regard to --

23           MR. DA SILVA:  I'm trying to measure this to make sure

24   I keep it within the lines of your prior rulings, Judge.

25

1   BY MR. DA SILVA:

2   Q.  With regard to your methodology in this particular case,

3   did you look at how CoreLogic -- or did you consider how they

4   compile the information?

5   A.  Yes.

6   Q.  Okay.  And does your independent review -- in your

7   independent review as a professional engineer, did you consider

8   and weigh what factors they put into the reports?  In other

9   words, did you look at the credibility, as far as you're

10  concerned, of the report?

11  A.  Yes.  I mean, I've been doing this a long time.  The

12  credibility has come up many times in Daubert hearings.  Many

13  times about Daubert, there have been courts that have accepted

14  CoreLogic.  You just haven't had the opportunity to present it.

15  But I've been in Daubert hearings where they've accepted

16  CoreLogic.  So there's one case that it was not accepted, but

17  I've been in many trials and many cases where it has been.

18  Q.  Are you -- if CoreLogic was eliminated from the

19  methodology, would you come up with the same opinions you came

20  up with in your report?

21  A.  Yes.

22  Q.  Could you express to the Court why.

23  A.  Because the physical evidence shows the damage, the wind

24  damage.  And the physical evidence shows that you would have to

25  have a significant wind speed to achieve the damages.  So you

```
1    can work it backwards.
2              MR. DA SILVA:  I don't think I have any other
3    questions, Judge.
4              THE COURT:  All right.
5              MR. FRANK:  May I inquire, Your Honor?
6              THE COURT:  You may.
7              MR. FRANK:  I'm sorry?
8              THE COURT:  Yes.
9              MR. FRANK:  Oh, okay.  Thank you.
10                       CROSS-EXAMINATION
11   BY MR. FRANK:
12   Q.  Mr. Brizuela, in your report on Page 30 -- do you have your
13   report in front of you, sir?
14   A.  I do now.
15   Q.  Okay.  On Page 3 of your report, up at the top, you state:
16   "During our inspection to the subject property, we noted
17   numerous water, moisture, and physical damages to the building
18   components.  In the following sections, we are going to explain
19   how these elements damaged the property's premises and why
20   these damages are consistent with wind force, wind pressure,
21   wind-driven rain and flying debris produced by the storm on
22   May 6th, 2019."  Did I read that correctly, sir?
23   A.  Yes.
24   Q.  Okay.  You focused on May 6th of 2019, correct?
25   A.  Correct.
```

1    Q.  If you turn to Page 36 of your report, under "Professional

2    Opinion" -- let me know when you're there, please, sir.

3    A.  Yes.

4    Q.  Could you read the first sentence of your professional

5    opinion.

6    A.  "In our professional opinion, wind pressure and wind gusts

7    produced by the storm of May 6th created avenues for moisture

8    to enter the structure through openings in the roof system."

9    Q.  Solely looking at May 6th, 2019, correct, sir?

10   A.  No, sir.  That was my conclusion.  I looked at the whole

11   period.  The May 6th was the result of the information at hand,

12   which I find CoreLogic to be reliable.  So that's why --

13   Q.  Okay.  And CoreLogic was the only weather data that you

14   used that you looked at, correct, sir?

15   A.  I looked at the weather data for Irma and for CoreLogic,

16   and for that period as well.

17   Q.  For the purposes of this report, you relied on the

18   information from CoreLogic, correct?

19   A.  I relied on CoreLogic and weather information that's

20   available on the Internet.

21   Q.  When I asked you in your deposition if you relied on any

22   other data besides CoreLogic, you indicated you did not.  Do

23   you recall that?

24   A.  It's possible.

25   Q.  Okay.  If you look at --

1    A.   Again -- excuse me, sir -- based on my experience during

2    that period of time, I would have known of the other

3    information and the weather data.   Now, I relied primarily on

4    CoreLogic for this report.

5    Q.   And, in fact, the only weather data you include within your

6    report -- specific weather data -- is CoreLogic, correct?

7    A.   Correct, because I find it reliable.

8    Q.   And that is on Page 20 of your report, where you have a

9    portion of the CoreLogic Wind Verification Report, correct?

10   A.   Yes, sir.   Like I said, I've used CoreLogic since 2018.

11   I've testified in hundreds of trials.   It's been accepted.   I

12   find it reliable.

13   Q.   And the only date during the policy period that's mentioned

14   in the CoreLogic Wind Verification Report, on Page 20 of your

15   report, is May 6th of 2019, correct?

16   A.   The date that will correspond to high wind events would be

17   May 6th.

18   Q.   And how does CoreLogic compile its information?

19   A.   Okay.   Well, CoreLogic uses Doppler radar.   It uses the

20   weather with information from the airports.   And they use

21   anecdotal information, in addition to what they have in their

22   white paper, a proprietary algorithm, which is an artificial

23   intelligence, to arrive at the weather data.   And --

24   Q.   And what portion of that -- I'm sorry.   I didn't mean to

25   cut you off, sir.   Please feel free to finish.

1    A.   So they use the same information that a meteorologist would

2    use.  And it's been used -- like I said, large universities,

3    even NASA, uses CoreLogic.

4    Q.   Where did you get the information as to what CoreLogic

5    uses?

6    A.   From their white paper and then from the review.  See, I

7    had a Daubert hearing back, I think, probably 2019, in another

8    case called Marquez in front of Judge Eig in Miami-Dade County

9    court.  And during that time, I was able to present in front of

10   the Judge probably 20 or 30 scholarly papers by universities,

11   even by NASA, that rely on CoreLogic for their weather.  So --

12   Q.   And -- I'm sorry.  Please feel free to finish.

13   A.   You can find yourself Googling -- through using Google, and

14   if you use CoreLogic and weather and documents, it will come

15   up.  And that's how I did mine.  There was a 30 -- a 20 -- and

16   he accepted it as to be reliable.

17   Q.   And what specific weather data, underlying weather data,

18   was used by CoreLogic for the purposes of this report?

19   A.   Doppler radar.  The weather on that day was the weather

20   from the Doppler, which -- the same information that

21   Mr. Bransome would have used.

22   Q.   And what weather stations were utilized by CoreLogic?

23   A.   The Doppler weather station in South Florida.

24   Q.   Well, which one?

25   A.   I don't know.

1    Q.  It doesn't indicate in the report.  Which one's used?

2    A.  There's -- the Doppler weather station that was more

3    appropriate for that -- for the -- for that property.

4    Q.  How do you know that?

5    A.  How do I know that?  Because that's what it says on the

6    white paper.

7    Q.  Okay.

8    A.  If you go to their website, it tells you exactly the

9    methodology, how they arrive at their data.

10   Q.  For this report?

11   A.  For all their reports.

12   Q.  Okay.  So it's a general white paper.  It does not apply to

13   the report that you're relying on?

14   A.  It's the methodology they use on every data search because

15   there's Doppler radar throughout the United States.  And

16   there's --

17   Q.  At what level does the Doppler radar measure the wind

18   speed, sir?

19   A.  It depends on the distance from the radar.  It's a

20   triangulation.  If you look at the paper, it explains it

21   exactly.  Depends on the distance from the tower.  There's a

22   triangulation to the site.  So it depends on the distance.

23   Q.  I'm sorry.  That was a bad question on my part.

24       At what height does the radar measure the wind speed, sir?

25   A.  Well, the wind speeds are tried to establish the standard

1    condition of 10 meters above the property.

2    Q.   But at what height is the Doppler radar utilized?

3    A.   The Doppler radar's distance, it varies from the location

4    of the tower to the site.

5    Q.   And what airport -- was any airport data utilized for the

6    CoreLogic report?

7    A.   They would have used the Kendall Regional, which is

8    approximately four miles away.  They would have used Miami

9    International, which is in a different direction to the

10   northeast.  Those would have been the two primary airports that

11   would have been used.

12   Q.   Those are the two primary airports that are in the

13   location, but do you know what was used by -- you don't know

14   what was used by CoreLogic, correct?

15   A.   They use the closest weather data, and those would be the

16   closest weather data.

17   Q.   And you base this on what?

18   A.   On the white paper that's at the -- in their website.

19   Q.   Okay.  But for the purposes of this report, you don't know

20   where the information was gathered from, correct?

21   A.   I just told you where it was gathered from, sir.  It was

22   from the nearest airports, and the nearest airports is what I

23   just told you.  We're going around in circles.

24   Q.   Well, we're going around in circles because you're basing

25   your testimony on a white paper without knowing exactly where

1 the data came from for the verification report that you use in

2 your report, correct?

3          THE COURT:  The objection is sustained.

4          Mr. Frank, we're getting far afield.  Your challenge

5 is with regard to the reliability of Mr. Brizuela's opinions

6 premised on the CoreLogic report.  Mr. Brizuela's report states

7 that he also relied on weather data from nearest weather

8 stations surrounding the subject property, i.e., wind speed,

9 maximum wind gusts, direction, and precipitation.  So to that

10 extent, since you have not challenged that portion of what

11 Mr. Brizuela has relied upon, let's stick to the four corners

12 of your motion.

13          MR. FRANK:  Your Honor, I understand what you're

14 saying.  But also, he did not -- in his report does not state

15 that he relies on that.  And in his deposition states that he

16 solely relies on the CoreLogic Wind Verification Report.  To

17 now --

18          MR. DA SILVA:  Objection.

19          MR. FRANK:  -- come at this point and state something

20 different is improper because he's never given us that

21 information previously.

22          MR. DA SILVA:  Objection.

23          THE COURT:  And once again, I understand the argument

24 that Mr. Brizuela has solely relied on CoreLogic.  And you may

25 certainly explore if, in fact, that was his sworn testimony.

1    But I did ask, with regard to photographs, if there's other

2    deposition testimony that expresses that he solely relied on

3    CoreLogic.  To the extent that it directly is consistent with

4    your challenge in our motion, you may certainly continue with

5    the cross-examination.

6          Is that contained within his deposition, that he

7    solely relied on CoreLogic?

8          MR. FRANK:  Yes, Your Honor.  I will have to find it.

9    But yes, it is.

10    (Pause in proceedings.)

11          MR. FRANK:  And Your Honor, I'll move on.  I'll

12    point -- I'll provide that to the Court.  But yes, in his

13    deposition he states that he relied solely on CoreLogic.  I'll

14    find it -- if you want, I will find it while we're proceeding

15    with one of the other matters, so as not to hold up the Court's

16    time on this.

17          THE COURT:  Do you have any further cross-examination?

18          MR. FRANK:  Your Honor, I guess the -- what we're --

19    what I was trying to point out was that in his report, from a

20    temporal perspective, he ties everything to the CoreLogic

21    report.  As I stated previously, his opinions that he read, and

22    that I read from his report, indicate that it's May 6th.  He

23    has nothing else that he has stated.  And, quite frankly, has

24    pointed to no other date when there was substantial wind events

25    that would allow for the uplift that he requires in order to

1  cause a tear in the membrane.  So we're dealing with May 6th,

2  which then comes back down to CoreLogic as being the sole basis

3  for that and which they have presented nothing to the Court to

4  support --

5          THE COURT:  Is there any further cross-examination

6  while Mr. Brizuela is sitting on the witness stand?

7          MR. FRANK:  No.  Other than me pointing out to the

8  Court that he -- and I'll find it and I'll cite to it -- that

9  he said he looked at no other wind data or no other weather

10  data except for CoreLogic.  And I'll provide that to the Court

11  later in the proceeding.

12          THE COURT:  All right.  Any redirect?

13                    REDIRECT EXAMINATION

14  BY MR. DA SILVA:

15  Q.  Mr. Brizuela, on your report, Page 5, did you give a

16  laundry list of everything you reviewed, including historical

17  weather data and weather data from the nearest weather stations

18  surrounding the subject property, bottom of Page 5, 118?

19  A.  Yes.

20  Q.  On Page -- sorry.  I lost my place.

21      On Page 19 of 118, did you cite the additional resources,

22  including NOAA, which is, of course, National Oceanic and

23  Atmospheric Administration, National Weather Services, and of

24  course the National Hurricane Center, as additional sources for

25  historical meteorological data, on Page 19 of 118?

1   A.   Yes.

2   Q.   Could you expand upon that with the Court.

3   A.   Well, I reviewed all that information.  That's readily

4   available.  Part of my opinion is that.  And in addition to

5   that, is CoreLogic as well.

6        (Pause in proceedings.)

7            MR. DA SILVA:  Reserving, of course, Judge, to rebut

8   anything Mr. Frank might find in the deposition testimony, I

9   have no further questions.

10           MR. FRANK:  Your Honor, if the Court would indulge,

11  could I ask one further question?

12           THE COURT:  Certainly.

13                        RECROSS-EXAMINATION

14  BY MR. FRANK:

15  Q.   Mr. Brizuela, can you tell the Court what the weather data

16  showed as the wind speed, maximum wind gusts, direction, and

17  precipitation from those other nearest stations surrounding the

18  subject property and what those weather stations were?

19           MR. DA SILVA:  Objection.  Outside of the four corners

20  of this motion.

21           THE COURT:  You're asking about the wind speeds?

22           MR. FRANK:  He's saying that he relied on other

23  aspects for his methodology.  And I'm asking what those other

24  wind speeds were from those weather stations.  Yes, Your Honor.

25           THE COURT:  But that's contained in his report.  Is

```
1     that -- that doesn't appear to be the subject of the challenge.

2              MR. FRANK:  No.  It's not contained in his report.

3              THE COURT:  Didn't he testify to that?

4              MR. FRANK:  No.

5              THE COURT:  Well, I see that he, in fact, did.  On

6     Page 79 of his deposition, you said:  "Look at the other wind

7     events going back this far because I see we only have like for

8     2012."  And he says:  "Right.  It -- I mean, let me see in the

9     file.  Let me go back.  Let me cut out the second page, bring

10    up the wind report.  There's two pages.  It goes to 2009.  When

11    I look at CoreLogic, the raw report, the last date is 2009.

12    May 27th we had wind at 55 miles per hour at the house."

13             MR. FRANK:  That's -- Your Honor, that's the CoreLogic

14    report.  The CoreLogic report shows --

15             THE COURT:  Isn't that what you're challenging,

16    Mr. Frank?  You're challenging his opinion based on the

17    CoreLogic report.

18             MR. FRANK:  I am.  And he is saying his methodology --

19    and Mr. Da Silva just brought up that he relied on other data.

20    And I'm saying he did not rely on other data and I'm asking him

21    to tell me what that data is, then, that he relied on that

22    would make his methodology appropriate outside of CoreLogic.

23             THE COURT:  And again, I understand the question.  But

24    it appears that -- if you're going to question Mr. Brizuela on

25    a point that he has testified to today that is inconsistent
```

1    with sworn testimony or his report, that's fine.  That's

2    proper.  But if you're merely going to have him reiterate

3    testimony that he's already given in his report or in his

4    deposition -- you specifically asked the question:  "How does

5    CoreLogic determine what's at the location?  I suspect there's

6    not a wind measuring tower."  And he says:  "Right.  I mean, I

7    don't know if you have ever hired a meteorologist.  How does a

8    meteorologist figure out -- at a location?  But from my

9    understanding, it's the same way that the meteorologist would

10   figure.  The weather service has a Doppler radar (audio

11   distortion).  And the Doppler can -- you can extract the wind

12   speeds at any point on the radar."  And then he goes on and he

13   testifies extensively with regard to the Doppler radar.

14          So I think we're getting really far afield from the

15   premise of the motion, and that is you're claiming the

16   CoreLogic report wind data is the basis for Mr. Brizuela's

17   opinions.  And testimony has been put forth with regard to his

18   methodology and I suspect I'm going to have an argument that it

19   is reliable.  And if there's a question with regard to the

20   basis of his opinion related to CoreLogic, you may certainly

21   explore.  But I think we've somewhat traveled down that road.

22          MR. FRANK:  Okay, Your Honor.

23          THE COURT:  All right.  Thank you, sir.

24   You may step down.

25          THE WITNESS:  Thank you, Your Honor.

1          (Witness excused.)

2                                    * * * * * * * * * *

```
1    UNITED STATES OF AMERICA        )

2    ss:

3    SOUTHERN DISTRICT OF FLORIDA  )

4                    C E R T I F I C A T E

5           I, Yvette Hernandez, Certified Shorthand Reporter in

6    and for the United States District Court for the Southern

7    District of Florida, do hereby certify that I was present at

8    and reported in machine shorthand the proceedings had the 7th

9    day of July, 2021, in the above-mentioned court; and that the

10   foregoing transcript is a true, correct, and complete

11   transcript of my stenographic notes.  Please note:  This

12   hearing occurred during the COVID-19 pandemic and is therefore

13   subject to the technological limitations of reporting remotely.

14          I further certify that this transcript contains pages

15   1 - 23.

16          IN WITNESS WHEREOF, I have hereunto set my hand at

17   Miami, Florida this 27th day of July, 2021.

18

19                       /s/Yvette Hernandez
                         _____
                         Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
20                       400 North Miami Avenue, 10-2
                         Miami, Florida 33128
21                       (305) 523-5698
                         yvette_hernandez@flsd.uscourts.gov
22

23

24

25
```